IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| INNERCITY FIBERNET, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| v. | ) | **(With Jury Demand)** |
| | ) | |
| ZAYO GROUP, LLC, | ) | Civil Action No. 3:15-cv-894 |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff InnerCity FiberNet, LLC ("ICFN") files this Complaint for Declaratory Judgment and Damages against Defendant Zayo Group, LLC, which merged with and is the successor in interest to and Zayo Fiber Solutions, LLC, (collectively, "Zayo"), and states:

## I.   INTRODUCTION

1. This dispute arises out of ICFN's "Indefeasible Right of Use" ("IRU") from Zayo that entitles it to access and use of a fiber optic network in the Dallas and Phoenix areas. Zayo has breached its agreements with ICFN, failed to provide and permit ICFN access, and illegally discriminated against ICFN—in favor of Zayo's subsidiary in direct competition with ICFN—in connection with ICFN's IRU. Zayo's conduct also violates state and federal law, including the Federal Communications Act of 1934 and Telecommunications Act of 1996. Zayo's wrongful acts have damaged ICFN, including but not limited to the loss of ICFN existing and/or prospective customers.

2. Further, Zayo has threatened to terminate the parties' agreement, despite the absence of conditions precedent therefor or any material breach by ICFN. Such a termination would further breach the parties' agreement, violate federal law, and interfere with ICFN's existing and prospective business relationships with customers, causing a massive blow to ICFN's core

business and affecting a majority of its customers who depend on ICFN's IRU to access the network for mission-critical business systems.

3. ICFN is in the process of demanding arbitration with Zayo through the American Arbitration Association ("AAA") pursuant to the parties' agreement to arbitrate. However, certain of ICFN's claims may be approaching deadlines under statutes of limitation. Filing an arbitration demand does not toll these deadlines. Accordingly, ICFN files this action (i) to preserve its claims, especially in the event Zayo disputes arbitrability of the claims, in whole or in part, or they must otherwise proceed outside arbitration; and (ii) in the event emergency injunctive relief, which the parties' agreement permits them to seek outside arbitration, becomes necessary to protect ICFN and its customers from imminent harm and irreparable injury, such as any attempt to interfere with the existing connections to the network or the customer's communications thereon. After Zayo appears and/or answers, ICFN anticipates filing a motion to stay this action while the arbitration proceeds. In short, ICFN intends to proceed with arbitration and does not waive the right to do so by filing this complaint.

## II.   JURISDICTION AND VENUE

4. This Court has diversity jurisdiction of this matter pursuant to 28 U.S.C. §1332(a), because the Plaintiff is a resident of states different from those of which Defendants are residents, and the amount in controversy exceeds $75,000.00, exclusive of costs and interest. In addition, by virtue of claims under the Federal Communications Act of 1996, 47 U.S.C. § 206, the Court also has federal question jurisdiction under 28 U.S.C. § 1331.

5. The fiber optic cable central to this lawsuit is physically located in the jurisdictional territory of the United States District Court for the Northern District of Texas.  Hence, venue is proper in this Court pursuant to 28 U.S.C. §1391.

### III. PARTIES

6. ICFN incorporates all prior allegations.

7. ICFN is organized pursuant to the laws of the State of Washington and maintains its principal place of business in Dallas, Texas.

8. ICFN is a Competitive Local Exchange Carrier ("CLEC") registered with the Public Utilities Commission of Texas.

9. Defendant Zayo Group, LLC ("Zayo Group") is organized under the laws of the state of Delaware, maintains its principal office in Boulder, Colorado, and maintains significant operations in the Dallas, Texas area.

10. In June 2011, Zayo Fiber Solutions, LLC ("Zayo Fiber"), which was organized under the laws of the state of Delaware, maintained its principal office in Boulder, Colorado, and had significant operations in the state of Texas, merged with Zayo Group, which is the surviving entity and Zayo Fiber's successor in interest.

11. Zayo Group is also a CLEC registered with the Public Utilities Commission of Texas.

### IV. FACTS

12. ICFN incorporates all prior allegations.

13. ICFN is in the business of marketing access to fiber optic networks directly to businesses in the Dallas-Ft. Worth area and servicing those fiber optic network connections.

14. Zayo is a global provider of bandwidth infrastructure services, including dark fiber.

15. This case concerns ICFN's ability to connect its customers to a major fiber optic ring/network in the Dallas-Ft. Worth area (the "Dallas-Ft. Worth Ring").

16. ICFN holds an indefeasible right of use ("IRU") in 45% of certain fiber-optic

cables in the Dallas-Ft. Worth Ring pursuant to a contract with Zayo Fiber and its affiliates, entered on March 2, 2011 (the "IRU Contract").

17. Zayo holds certain rights to the fiber in the Dallas-Ft. Worth Ring pursuant to an IRU contract with Sunesys, LLC ("Sunesys").

18. Upon information and belief, Sunesys owns the fiber and many of the handholes and manholes used to access the system.

19. Sunesys maintains its rights pursuant to an IRU contract with Level 3 Communications, Inc.–the original lessor and owner of the conduit containing the fibers in the Dallas-Ft. Worth Ring.

20. Under the IRU Contract, Zayo promised and represented to ICFN that the fibers granted to ICFN would be "dark fiber," meaning that the fibers would not be in use by any other entity. Zayo affirmatively represented that the fibers were "free and clear."

21. ICFN learned that, in fact, the fibers granted it under the IRU Contract were not all dark.

22. Windstream KDL, Inc. was using the fibers that were granted to ICFN by Zayo. The fibers were not "free and clear" as Zayo had represented.

23. ICFN was forced to file suit against Windstream in 2013 to enforce its rights to the fiber. That suit was settled in June 2014.

24. Many of ICFN's customers operate in buildings throughout the Dallas area.

25. For a customer to be connected to others with fiber optics, a lateral line from the customer's building must be directly connected – or "spliced" – into the Dallas-Ft. Worth Ring.

26. The IRU Contract and the fiber rights granted to ICFN thereunder are worthless to ICFN if ICFN cannot splice its customers into the Dallas-Ft. Worth Ring. Access to the Dallas-Ft.

Worth Ring, including the right to splice ICFN and customer laterals into the Dallas-Ft. Worth Ring, is critical for ICFN to realize any benefit out of the IRU Contract.

27. Zayo agreed to provide access, as well as any requested services to connect ICFN's network and its customers, to the Dallas-Ft. Worth Ring.

28. Around March 28, 2011, shortly after the IRU Contract was entered, Greg Stilwell, CEO of ICFN and Keith Osborn, a construction manager with then-Zayo Fiber, agreed to create three (3) splice points along the Dallas-Ft. Worth Ring, at 8600 Harry Hines Blvd., Dallas, Texas; 3000 Irving Blvd., Dallas, Texas; and 3180 Irving Blvd., Dallas, Texas.

29. Pursuant to that agreement, ICFN selected, with Zayo's approval, the contractor Future Telecom, Inc. ("Future") to install the above splice points, which splice points Future did complete at ICFN's expense. Future installed new handholes and/or manholes at splice points and connected ICFN customers to the Dallas-Ft. Worth Ring with Zayo's express approval.

30. At various intervals afterward, ICFN and Zayo developed a course of dealing pursuant to which ICFN would request access to various splicing points and, once access was expressly granted, ICFN would engage Future to install manholes/handholes and/or splice ICFN's customers into the Dallas-Ft. Worth Ring.

31. Moreover, on multiple occasions on which the IRU Contract provided that Zayo give written notice to ICFN of certain action that Zayo was taking, Zayo failed to provide written notice to ICFN. This conduct by Zayo further cemented the course of dealing between the parties.

32. To the extent that Zayo will claim ICFN breached the IRU Contract because it failed to notify Zayo of certain actions prior to undertaking those actions, Zayo has by its conduct waived the right to complain about such conduct and is estopped to complain about lack of notification from ICFN.

33. This course of dealing persisted until around March 2014.

34. Greg Stilwell died in August 2012.

35. Around July 2012, Zayo Group, LLC acquired AboveNet, Inc.

36. After acquiring AboveNet, Zayo increased its retail operations in the Dallas-Ft. Worth area, marketing fiber optics directly to businesses.

37. This placed Zayo in direct competition with ICFN for customers in the Dallas-Ft. Worth area and on the Dallas-Ft. Worth Ring.

38. Nevertheless, and until around March 2014, pursuant to the above course of dealing, ICFN created multiple splice points along the Dallas-Ft. Worth Ring using Future, a Zayo-approved contractor, to perform the work.

39. However, around March 2014 Zayo insisted that the prior course of dealing and protocol for splicing work be changed such that Zayo would have to approve, supervise, and control all splicing work going forward.

40. ICFN reluctantly consented to this change from the prior arrangement.

41. Zayo began charging ICFN exorbitant rates for these services. In some cases, the rates and fees Zayo charged to ICFN for splicing construction were as much as three hundred percent of the total fees typically charged to ICFN by Future to perform similar work.

42. Additionally, Zayo began ignoring and/or delaying requests from ICFN for splicing its customers onto the network and ceased performing requested splicing services for ICFN on a timely basis. Zayo's delays made it difficult to market ICFN services to new customers.

43. On or about January 15, 2015, ICFN specifically and formally requested Zayo to splice in a new major ICFN customer to the Dallas-Ft. Worth Ring.

44. Zayo indicated in a meeting that it would perform the splicing work.

45. Even under Zayo's typical delays, the splicing should have been completed by January 31, 2015.

46. In spite of ICFN's multiple and repeated requests for splicing services, Zayo refused to perform and ceased responding to the inquiries.

47. ICFN is incurring and continues to incur significant losses of revenue as a result of Zayo's refusal to splice the new customer.

48. On February 20, 2015, Zayo sent ICFN a letter alleging that ICFN was in breach of the IRU Contract with respect to accessing splicing points.

49. Zayo accused ICFN of illegally splicing customers into the Dallas-Ft. Worth Ring without permission from Zayo, in breach of the IRU Contract.

50. Zayo cited seven (7) purported instances in which it accused ICFN of illegally splicing into the Dallas-Ft. Worth Ring in violation of the IRU Contract.

51. Zayo cited the three (3) splicing points that Stilwell negotiated with Osborn around March 2011.

52. Zayo also cited two (2) splicing points where ICFN engaged Future pursuant to the above-mentioned course of dealing.

53. Zayo further accused ICFN of splicing and/or drilling handholes in two (2) other locations where some other third party–not ICFN–had contracted for the splicing and/or drilling.

54. ICFN responded by pointing out that ICFN had not "illegally accessed" the network in any way and asking whether Mr. Osborn of Zayo refuted the permitted access.

55. In response, Zayo threatened to terminate the IRU Contract if ICFN did not "cure each breach, by restoring Zayo's network to its original (pre-breach) condition."

56. In effect, Zayo demands that ICFN disconnect service to customers at seven (7) of

its Dallas splice points.

57. The result of these disconnections would cause ICFN to lose in excess of $60,000 per month in revenues.

58. Such disconnections would severely cripple ICFN as a business entity, if not prevent it from operating entirely.

59. If ICFN is forced to disconnect its customers, then it will be substantially and irreparably harmed because those customers will likely seek an alternative fiber optics provider.

60. That alternative provider is likely to be Zayo, who is now ICFN's direct competitor and operates 55% of the same network.

61. If, as threatened, Zayo terminates the IRU Contract and/or continues to prevent access to the network, ICFN will be irreparably harmed.

62. Additionally, as of February 25, 2015, Zayo informed ICFN that it has put a moratorium on all splicing of new ICFN customers if the purported breaches relating to the seven (7) splice points are "not resolved."

63. ICFN has rebutted Zayo's allegations of illegal access with evidence of the underlying course of dealing, supported by the Zayo-approved contractor who performed the splicing work, but Zayo has refused to respond to these corrections.

## V.   CAUSES OF ACTION
## CLAIM ONE

(Breach and/or Repudiation of Contract)

64. ICFN incorporates all prior allegations.

65. ICFN and Zayo entered the IRU Contract on March 2, 2011.

66. An implied term of the IRU Contract is that Zayo will not unreasonably withhold or obstruct ICFN's right to access the Dallas-Ft. Worth Ring, which is critical for ICFN to realize any

benefit out of the IRU Contract.

67. A further implied or express term of the IRU Contract is that Zayo will provide or allow ICFN access to the network, directly or indirectly, to enable ICFN to connect customers to the Dallas-Ft Worth Ring, and that where Zayo provides such services, its rates are reasonable and such connection services will be performed within a reasonable timeframe.

68. Moreover, even if the IRU Contract omitted a specific protocol for ensuring ICFN's access to the Dallas-Ft. Worth Ring, the parties' subsequent course of dealing established it. Specifically, Stilwell and Osborn reached agreement on the first several splice points, and the parties' established course of dealing was for ICFN to engage Future, a Zayo-approved contractor, in order to create new customer splice points.

69. Alternatively, the parties' amended any express protocol for access and connection to the Dallas-Ft. Worth Ring through their course of dealing.

70. ICFN has substantially performed under the Zayo Agreement, and all conditions precedent to Zayo's performance thereunder, including but not limited to services to connect new ICFN customers, have been performed or have occurred.

71. Zayo breached the express and implied terms of the IRU Contract by denying ICFN access to the Dallas-Ft. Worth Ring, unreasonably delaying and/or overcharging for the required services to install new connections, and preventing ICFN from connecting its new customers.

72. For example, Zayo has refused, and continues to refuse, to effectuate a request that ICFN made on or about January 15, 2015 for services to connect a new ICFN customer and has placed a complete moratorium on splicing ICFN customers into the Dallas-Ft. Worth Ring.

73. Zayo's unreasonable delays and later refusal to splice ICFN's customers into the network denies ICFN the benefit of the IRU Contract and therefore materially breached the parties'

benefit out of the IRU Contract.

67. A further implied or express term of the IRU Contract is that Zayo will provide or allow ICFN access to the network, directly or indirectly, to enable ICFN to connect customers to the Dallas-Ft Worth Ring, and that where Zayo provides such services, its rates are reasonable and such connection services will be performed within a reasonable timeframe.

68. Moreover, even if the IRU Contract omitted a specific protocol for ensuring ICFN's access to the Dallas-Ft. Worth Ring, the parties' subsequent course of dealing established it. Specifically, Stilwell and Osborn reached agreement on the first several splice points, and the parties' established course of dealing was for ICFN to engage Future, a Zayo-approved contractor, in order to create new customer splice points.

69. Alternatively, the parties' amended any express protocol for access and connection to the Dallas-Ft. Worth Ring through their course of dealing.

70. ICFN has substantially performed under the Zayo Agreement, and all conditions precedent to Zayo's performance thereunder, including but not limited to services to connect new ICFN customers, have been performed or have occurred.

71. Zayo breached the express and implied terms of the IRU Contract by denying ICFN access to the Dallas-Ft. Worth Ring, unreasonably delaying and/or overcharging for the required services to install new connections, and preventing ICFN from connecting its new customers.

72. For example, Zayo has refused, and continues to refuse, to effectuate a request that ICFN made on or about January 15, 2015 for services to connect a new ICFN customer and has placed a complete moratorium on splicing ICFN customers into the Dallas-Ft. Worth Ring.

73. Zayo's unreasonable delays and later refusal to splice ICFN's customers into the network denies ICFN the benefit of the IRU Contract and therefore materially breached the parties'

agreements, proximately causing ICFN substantial damages, including but not limited to lost revenues from customers that ICFN cannot connect to the Dallas-Ft. Worth Ring.

74. Alternatively, Zayo's threat and unequivocal statement that it would terminate the IRU Contract and, hence, cut off existing ICFN customers from the network, constitutes an anticipatory repudiation, proximately causing ICFN damages.

75. In addition, Zayo did not provide the number of dark fibers set forth in the contract, which necessitated ICFN filing suit against users of ICFN dark fibers to determine the rights of use.

76. In addition to the foregoing, and pursuant to Tex. Civ. Prac. & Rem. Code 38.001, ICFN seeks to recover its reasonable attorney's fees.

## CLAIM TWO

(Unfair Competition - Tortious Interference with Prospective and Existing Business Relationships)

77. ICFN incorporates all prior allegations.

78. Around January 2015, ICFN agreed to enter a business relationship with a company, 1515 Roundtable ("1515"), whereby ICFN would provide fiber optic services in exchange for 1515's regular monthly payments.

79. On January 15, 2015, ICFN requested that Zayo, pursuant to the IRU Contract, perform certain splicing work to connect 1515 to the Dallas-Ft. Worth Ring.

80. Zayo did not perform the splicing services and refused to respond to ICFN's inquiries regarding the same.

81. Now, Zayo refuses to perform any splicing work at all.

82. Part of 1515's management and/or ownership recently sold a data center to Zayo, but subsequently opened up a competing data center nearby.

83. Zayo knew, or had knowledge of facts and circumstances that would lead a reasonable person to conclude, that 1515 had engaged ICFN to connect 1515 to the Dallas-Ft. Worth Ring. By wrongfully refusing to connect 1515 to the network at ICFN's request, Zayo willfully and intentionally interfered with the business relationship between 1515 and ICFN.

84. Alternatively, Zayo knew that there was a reasonable probability that ICFN would have entered a contract with 1515 to connect 1515 to the Dallas-Ft. Worth Ring.

85. By wrongfully refusing to connect 1515 to the network at ICFN's request, Zayo willfully and intentionally interfered with the business relationship between 1515 and ICFN.

86. Zayo's conduct is independently tortious in that it violates the Communications Act of 1934 and the Telecommunications Act of 1996 (see claim below).

87. Such tortious interference has proximately and actually harmed ICFN by preventing ICFN from collecting revenues from customers, including but not limited to 1515, that ICFN otherwise would have collected, absent the interference.

## CLAIM THREE

(Federal Communications Act of 1934 and Telecommunications Act of 1996)

88. ICFN incorporates all prior allegations.

89. As a competitive local exchange carrier, Zayo has certain duties and obligations under the Federal Communications Act of 1934 and the Telecommunications Act of 1996.

90. It is unlawful for Zayo "to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or

unreasonable prejudice or disadvantage." 47 U.S.C. § 202(a).

91. Zayo has refused to carry out ICFN's requests for splicing new customers into the Dallas-Ft. Worth Ring.

92. Because Zayo will not provide access or allow ICFN to access the network independently, Zayo's practice in this regard unreasonably discriminates against ICFN in favor of Zayo–ICFN's competitor–by causing frustrated ICFN customers to turn to other providers for fiber services they would have engaged ICFN for.

93. The same conduct subjects ICFN to undue and unreasonable prejudice and disadvantage, insofar as ICFN is completely unable to connect new customers to the Dallas-Ft. Worth Ring while Zayo may continue to do so.

94. Zayo's threat to terminate the IRU Contract on an unsubstantiated basis further indicates that Zayo is attempting to subject ICFN to unreasonable prejudice and disadvantage by forcing ICFN to disconnect and relinquish its current customers.

95. Zayo's unreasonable charges for splicing construction services–which Zayo undoubtedly does not incur when contracting for its own splicing–are further evidence of Zayo's discriminatory designs against ICFN.

96. The above conduct by Zayo violates 47 U.S.C. § 202(a).

97. As a result of Zayo's conduct, ICFN has suffered, continues to suffer, and will further suffer, substantial damages.

98. Under the Telecommunications Act of 1996, Zayo, as a local exchange carrier, has a duty "not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services." 47 U.S.C. § 251(b)(1).

99. Zayo also has a duty "to afford access to the poles, ducts, conduits, and

rights-of-way of [Zayo] to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224 [of the Telecommunications Act of 1996]." 47 U.S.C. § 251(b)(4).

100. Zayo is in breach of these statutory duties because it is imposing unreasonable limitations on ICFN's ability to resell the telecommunications services that it provides to customers by way of the IRU Contract. Such unreasonable limitations include the refusal to perform splicing services or to grant access when ICFN requests to splice new customers into the Dallas-Ft. Worth Ring, as well as the unsubstantiated accusations of illegal access and attendant demand that ICFN disconnect its current customers.

101. Zayo is also in breach of its statutory duties because it is outright refusing to afford ICFN access for new customers to the conduit and/or right-of-way that constitutes the Dallas-Ft. Worth Ring.

102. Upon information and belief, Zayo does not own the conduit, handholes or manholes used to access the Ring, but is nevertheless attempting to assert exclusive dominion and control over access to the Ring.

103. Zayo intends to further breach these statutory duties by terminating the IRU Contract on an unsubstantiated basis. The effect of such a termination would be to outright deny ICFN access to the Dallas-Ft. Worth Ring and to disrupt ICFN's relationships with its customers.

104. The above conduct indicates Zayo's refusal to abide by, and violations of, 47 U.S.C. §§ 251(b)(1) and (4).

105. As a result of Zayo's conduct, ICFN has suffered, continues to suffer, and will further suffer, substantial damages.

106. Under 47 U.S.C. § 206, "[i]n case any common carrier shall do, or cause or permit

to be done, any act, matter, or thing in this Act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this Act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this Act, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case."

107. Zayo is a common carrier under the Act because it provides wire transmittal services.

108. The above violations of the Communications Act of 1934 and the Telecommunications Act of 1996 render Zayo liable to ICFN for damages and attorney fees pursuant to 47 U.S.C. § 206.

## CLAIM FOUR
(Declaratory Judgment)

109. ICFN incorporates all prior allegations.

110. Pursuant to 28 U.S.C. §§ 2201 *et. seq*. and Tex. Civ. Prac. & Rem. Code § 37.001 *et seq*., ICFN states that an actual controversy exists with Zayo and seeks a declaration regarding their rights and other legal relations.

111. Zayo has asserted that ICFN breached the IRU Contract with respect to seven (7) splice points and has demanded, in effect, that ICFN disconnect its customers from the Dallas-Ft. Worth Ring. Zayo has also placed a moratorium on new connections for ICFN customers.

112. ICFN has business relationships with many customers via the Dallas-Ft. Worth Ring, including at the seven (7) splice points where Zayo demands ICFN disconnect its customers.

113. Zayo is fully aware that disconnecting these splice points will interfere with and

obliterate ICFN's existing customer relationships that are serviced at these splice points.

114. Zayo has unequivocally indicated that Zayo intends to do severe actual harm to ICFN through its interference with ICFN's existing customers by terminating the IRU Contract.

115. ICFN seeks a declaration regarding (i) interpretation of the IRU Contract and ICFN's express and implied right to access the Dallas-Ft. Worth Ring, including the parties' respective rights and obligations regarding services to connect ICFN customers to the network; (ii) Zayo's obligation to provide, directly or indirectly, splicing services to provide such access on reasonable terms and under reasonable timeframes; (iii) ICFN's substantial performance pursuant to the IRU Contract, including but not limited to the parties' course of performance; (iv) Zayo's obligation under the Zayo Agreement, state and federal law to refrain from discrimination against ICFN in favor of Zayo's Affiliates in connection with access to the Dallas-Ft. Worth Ring and the provision, pricing, and timing of Zayo's services to connect customers; and (v) that Zayo may not terminate the IRU Contract and the absence of conditions precedent for such termination.

116. Pursuant to the foregoing Declaratory Judgment Acts, ICFN is entitled to recover its reasonable attorney's fees.

## VI.   ARBITRATION

117. ICFN intends to proceed with arbitration as provided by the IRU Contract. This action is filed to preserve claims, and ICFN does not waive its right to proceed in arbitration. Accordingly, ICFN states that, upon the filing of this lawsuit and after the answer or appearance by Zayo, ICFN will move to stay the action pending a final award by an arbitrator duly appointed by the American Arbitration Association.

## VII. <u>RELIEF REQUESTED</u>

ICFN respectfully requests the following relief from the Court:

(i) That Zayo be cited to appear and answer;

(ii) This action be stayed pending the parties' arbitration;

(iii) ICFN be granted a jury trial on all its claims;

(iv) Declaratory judgment as set forth herein;

(v) A judgment against Zayo for actual, consequential and any other monetary damages suffered by Plaintiff, together with costs of the litigation;

(vi) Pre-judgment and post-judgment interest at the maximum rate allowed by law;

(vii) Attorney fees and expenses; and

(viii) All other relief, whether general or special, legal or equitable, to which Plaintiff may be entitled.

This the 20th day of March, 2015.

    /s/ Michael G. Wimer
Michael G. Wimer
TX Bar # 21750810
Asheville Law Group
349 Haywood Road
Asheville, NC 28806
Telephone: 828-350-9799
Facsimile: 828-350-9894
mwimer@ashevillelawgroup.com

/s/ Raymond E. Walker
Raymond E. Walker
TX Bar # 24037663
 Figari & Davenport, LLP
901 Main Street, Suite 3400
Dallas, TX 25202
 Telephone: (214) 939-2000
 Facsimile: (214) 939-2090
ray.walker@figdav.com

***Attorneys for Plaintiff***